**UNITED STATES of America**

v.

**Thomas W. MOORE, Jr., Appellant.**

**No. 73–1192.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 25, 1973.

Decided Oct. 18, 1974.

Certiorari Granted Feb. 18, 1975.
See 95 S.Ct. 1116.

</div>

Raymond W. Bergan, Washington, D. C., for appellant. Edward Bennett Williams and Steven M. Umin, Washington, D. C., were on the brief for appellant. John B. Kuhns, Washington, D. C., also entered an appearance for appellant.

Peter C. Schaumber, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Vincent R. Alto, Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

BAZELON, Chief Judge:

■ Appellant, a licensed physician, was registered under § 822 of the Controlled Substances Act [1] to prescribe methadone. He was convicted of violating § 841 of the Act, which forbids prescriptions without authorization. We find § 841 inapplicable to appellant and reverse his conviction.

■ Our conclusion is reached by force of the established principle that "when [a] choice has to be made between two readings of what conduct Congress had made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." [2] This rule, of course, cannot serve to "override . . . evident statutory purpose." [3] In the search for an "evident statutory purpose," our analysis necessarily covers a complex maze of statutory language, regulatory provisions, and previous legislation.

## I

Methadone is an addictive drug which can be used in the treatment of narcotics addiction.[4] A heroin addict who switches to methadone may experience neither a craving for heroin nor a euphoric "high." Moreover, methadone can be taken orally once a day, while heroin must often be injected several times a day.

There are two general approaches to the use of methadone in treating addicts —maintenance and detoxification. Under a system of maintenance, a large dose of methadone is given once a day for an indefinite period in order to keep the patient from taking heroin. In detoxification, the less controversial approach, a large dose of methadone is given for the first few days in order to keep the patient free of withdrawal symptoms. The dose is then gradually reduced, ultimately to achieve abstinence from all drugs.

The evidence at appellant's trial established that from August, 1971 to February, 1972 appellant prescribed methadone to numerous patients. Under the Controlled Substance Act only those doctors who have obtained registration from the Attorney General can prescribe a "controlled substance" such as methadone.[5] Appellant had obtained such registration for the period in question and it was never revoked during that period.

Appellant contended at trial that he prescribed methadone in good faith for detoxification. The government argued that appellant was no more than a "pusher":

[H]e used the physician's cloak as a cover to sell drugs . . . There was no medical purpose behind this— there was only one purpose: money.

As appellant concedes in his brief to this court,[6] the evidence at trial established that he engaged in certain highly

---

1. All sections of the Controlled Substances Act referred to in the opinion are reproduced in Appendix I *infra*. References are to section numbers of the Act as codified, 21 U.S.C. § 801 et seq.

2. United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 221–222, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952).

3. United States v. Brown, 333 U.S. 18, 25, 68 S.Ct. 376, 92 L.Ed. 442 (1948).

4. The brief description which follows of the nature and use of methadone is based on expert testimony given at appellant's trial.

5. 21 U.S.C. § 822(b), Appendix I *infra*. § 812 divides controlled substances into five "schedules" based on the drug's potential for abuse, accepted medical use and the like. Methadone is a schedule II drug. *See* 21 U.S.C. § 812(c), Schedule II(b)(11). For the properties of a schedule II drug, see § 812(b)(2), Appendix I *infra*.

6. Appellant's Brief at 4–5.

irregular practices during the period in question:

1.) He prescribed methadone in whatever quantities the patient requested;

2.) His fees were graduated in accordance with the quantity of methadone prescribed;

3.) He did not make certain that the patients for whom he was prescribing methadone were addicts. Some were not, and some delivered their methadone to non-patients.

In a 639-count indictment filed June 27, 1972,[7] appellant was charged with violating § 841(a) of the Controlled Substances Act:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to . . . distribute, or dispense [that is, prescribe] . . . a controlled substance.

When appellant was arraigned, the trial judge told the prosecutor that the theory of the government's case would have to be spelled out in greater detail since "the indictment doesn't tell the defendant anything." Accordingly, at a pre-trial hearing government counsel offered an oral bill of particulars. Counsel noted that pursuant to a provision in the Controlled Substances Act the Attorney General had promulgated regulations governing those registered to prescribe controlled substances. The government relied on appellant's alleged violation of one of those regulations:

[Government Counsel]: [T]he Government would rely on the Section numbered 306.04. And, the two main sections or the two main parts of that section that apply to this case, that is, the specific theories of the Government's case, is section (a) which states in part: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner, acting in the usual course of his professional practice."

It is the Government's contention and theory that the conduct by Dr. Moore in giving out these prescriptions was not for a legitimate medical purpose, and secondly, that he was not acting in the usual course of his professional practice.

The second aspect of that regulation is part (c), which states in part: "A prescription may not be issued for the dispensing of narcotic drugs to a drug addict for the purposes of continuing his dependence upon such drugs."

It is the Government's contention that these prescriptions were issued to maintain these drug addicts as drug addicts, and that he was not issuing these prescriptions to detoxify them, but retaining them as drug addicts.

So, that really boils down to the end result of what I stated, that he was conducting methadone maintenance or maintaining drug addicts rather than detoxifying them as he was only authorized to do by his regulations, and by his violation of these regulations he violated 841(a) of the CSA.

THE COURT: I will take that statement which you made, Mr. Alto, in the nature of a Bill of Particulars, and limit your proof accordingly, and it will be of notice to [defense counsel] as to the theory of the case.

[Government Counsel]: Yes, your Honor.

Appellant's trial commenced on October 17, 1972. After the prosecution rested, the defense moved for a judgment of acquittal, noting that the government had failed to establish that appellant was not authorized to write prescriptions for methadone. The motion was denied. After the defense rested, the court, in keeping with the govern-

---

7. On September 26, 1972 the Government announced its intention to sever 588 counts. A retyped forty-count indictment was subsequently accepted by the court for filing.

ment's theory of the case, instructed the jury that it had to find:

> beyond a reasonable doubt that a physician who knowingly or intentionally did dispense or distribute [methadone] by prescription, did so other than in good faith for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States.

The jury returned a verdict of guilty on 22 counts. Appellant was sentenced to prison terms of five to fifteen years on each of fourteen counts, all to run concurrently, and ten to thirty years on each of the remaining eight counts, to run concurrently to each other but consecutively to the first set of sentences. Fines totalling $150,000 were also imposed.[8]

## II

Appellant contends that his indictment must be dismissed because § 841 of the Controlled Substances Act does not apply to doctors registered to dispense methadone. He argues that if he acted unlawfully he was subject to trial only under those sections of the statute which specifically govern the activities of registered doctors—sections with less severe penalties than those in § 841. This contention is the only one we address. We do not decide under what circumstances, if any, an individual such as appellant could lawfully administer a methadone maintenance program. Nor do we decide whether appellant was in fact maintaining addicts, detoxifying them, or simply pushing drugs. We may assume that appellant, a licensed

physician registered to prescribe methadone, acted wrongfully. We are only concerned with the consequences of such action.

There is support in the language and history of § 822 of the Act for appellant's contention that § 841 does not apply to him. § 822(b) specifically provides that persons registered by the Attorney General to dispense controlled substances are "authorized [to do so] to the extent authorized by their registration and in conformity with the other provisions of this subchapter." The language echoes the "except as authorized" language of § 841, suggesting immunity for registrants from the penal sanctions provided for in that section. Of course, that a registrant is "authorized . . . to the extent authorized" lends some credence to a theory that Congress did not intend authorization for registrants to extend beyond compliance with the other provisions of the Act and the regulations promulgated thereunder.

The legislative history of § 822, however, weighs against such a theory. The Act, as it was originally passed by the Senate,[9] did not contain a section comparable to § 822(b). The provision was inserted by the House Committee on Interstate and Foreign Commerce, which flatly stated in its report that the purpose of the addition was "to make it clear that persons registered under this title are authorized to deal in or handle controlled substances." [10] The Committee's explanation contains no suggestion that it intended to authorize only registrants who complied in every way with responsibilities established under other sections of the Act.[11]

---

8. Appellant's license to practice medicine in the District of Columbia was also revoked pursuant to 2 D.C.Code § 131.

9. S. 3246, 91st Cong., 2d Sess. (1970). The Act passed the Senate on January 28, 1970. 116 Cong.Rec. 1671.

10. H.R.Rep. No. 91–1444, 91st Cong., 2d Sess. 38 (1970), U.S.Code Cong.Admin.News 1970, p. 4606.

11. The Committee's report does suggest that registrants' authorization is limited to what their *registration* authorizes them to do. *Id.* But even if this suggestion is taken as clarifying Congress' intent on this point, the prosecution's theory of the case did not rest on the appellant's violation of the terms of his registration, but much more broadly on his alleged activities outside the "usual course of practice." *See* text accompanying note 13 *supra;* Brief for Appellee at 61.

Appellant's reading of § 841 gathers further support from its place in the overall scheme of the Act. The Act insures the close regulation of registrants. Section 822(f) gives the Attorney General authority to inspect the offices of registrants. Standards and procedures are set forth in § 824 for revoking or suspending an individual's registration; revocation and suspension, as tools for the administrative control of the flow of drugs, have recently been strengthened by the passage of the Narcotic Addict Treatment Act.[12] Under §§ 828 and 829, requirements are detailed for the proper order forms and prescriptions in the distribution or prescription of drugs.

This administrative machinery is backed up by the penalties provided for in §§ 842 and 843. § 842 outlaws issuing prescriptions in violation of § 829, mislabelling drugs and similar misconduct. Violators of § 842 are subject to a civil penalty of $25,000 and, if a violation is knowing, a criminal penalty of a year imprisonment and a fine of $25,000. § 843 defines more serious offenses for registrants, such as distributing a controlled substance when there is no proper order form and using a fictitious registration number. Violations are punishable by four years' imprisonment and a $30,000 fine.

In contrast to §§ 842 and 843, § 841 does not mention "registrants" as the focus of any of its provisions. It provides for sentences of up to 15 years and fines of up to $25,000. This broad outline strongly suggests that Congress intended to deal with registrants primarily through a system of administrative controls, relying on modest penalty provisions to enforce those controls, and reserving the severe penalties provided for in § 841 for those seeking to avoid regulation entirely by not registering.

As already noted, the regulations which served the Government as a bill of particulars in appellant's trial appear in § 306.04 of the regulations implementing the statute. Part 306 is specifically limited to:

[r]ules governing the issuance, filling, and filing of prescriptions pursuant to . . . 21 U.S.C. § 829 . . .[13]

Punishment for violation of § 829 is specifically provided for in § 842. Against the statutory background which we have sketched, it cannot have been evident to appellant that he would *also* be punishable under § 841(a), which makes no reference to § 829 or the obligations which it imposes on registrants.[14]

---

12. Act of May 14, 1974, Pub.L.No. 93–281, 88 Stat. 124.

That Act amended §§ 822 and 824, which provides for the revocation and suspension of registrations. It requires a special registration for practitioners administering maintenance or detoxification programs and authorizes the Attorney General to revoke this registration for failure to meet standards which he is authorized to promulgate. The dissent contends that the legislative history of NATA refutes our reading of § 841. The case of Dr. Moore is discussed in the Senate Report on NATA as a "most notorious" example of the diversion of drugs for illicit use and sale by a registered practitioner, and his conviction and the length of his sentence are noted with apparent approval. S.Rep.No. 93–192, 93 Cong., 1st Sess. 7 (1973).

NATA, of course, was passed after this appeal had been briefed and argued in our court, and there is a question therefore as to how much its history can be relied on in meeting appellant's arguments. In any event, it seems to us that Congress' approbation of Dr. Moore's conviction is not strong evidence of its purpose in passing § 841, which incidentally was enacted some four years earlier by a differently constituted Senate and House. Section 841, in fact, is not considered in the Senate or House Reports on NATA, and with good reason, for Congress' central concern in the passage of that Act was not criminal prosecutions at all but the deregistration of abusers. The step which it took is perfectly consistent with the view that its broad intent, from the outset, was to deal with registrants through administrative controls rather than the harsh penal provisions of § 841.

13. 36 Fed.Reg. 7799 (1971).

14. We need not and do not decide whether § 306.04 of the regulations is sufficiently specific for the invocation of criminal sanctions, nor whether Congress intended that violations of regulations trigger criminal prosecutions under the Controlled Substances Act.

## III

The government seeks to justify its prosecution of appellant by reference to judicial construction of the Harrison Narcotic Act of 1914,[15] the predecessor of the Controlled Substances Act. In order to evaluate this contention we must consider the structure of the Harrison Act. Section 1 required that persons selling or prescribing certain narcotics register with the "collector of internal revenue of [their] district" and pay an annual tax. Section 2 made it unlawful to sell or prescribe narcotics except to persons with order forms issued by the Commissioner of Internal Revenue. Section 2 exempted the prescribing "of any of the aforesaid drugs to a patient by a physican . . . [regularly] registered under this Act in the course of his professional practice only . . ." All violations of the Act were punished under Section 9 by imprisonment of up to five years and fines of up to $2,000.

The government notes that under court decisions construing the Harrison Act a physician could lose his exemption from Section 2 by distributing drugs in an unprofessional manner.[16] They refer to decisions such as Jin Fuey Moy v. United States, in which the Supreme Court held in 1920 that:

> Manifestly the phrases "to a patient" and "in the course of his professional practice only" are intended to confine the immunity of a registered physician, in dispensing the narcotic drugs mentioned in the act, strictly within the appropriate bounds of a physician's professional practice, and not to extend it to include a sale to a dealer

or a distribution intended to cater to the appetite or satisfy the craving of one addicted to the use of the drug. A "prescription" issued for either of the latter purposes protects neither the physician who issues it nor the dealer who knowingly accepts and fills it.[17]

The government maintains that the foregoing principles are "analogously dispositive"[18] and dictate that under the Controlled Substances Act appellant was stripped of his exemption from § 841 by his unprofessional conduct.

The Controlled Substances Act, however, is fundamentally different from the Harrison Narcotic Act. Indeed, as its legislative history indicates, the Controlled Substances Act replaces the Harrison Act's single penalty provision with a series of penalty provisions specifically designed to treat registered and unregistered individuals differently.

The penalty provisions now embodied in §§ 841, 842, and 843 of the Controlled Substances Act were first before Congress when the Senate considered the Controlled Dangerous Substances Act of 1969. §§ 501–503 of the Senate bill[19] contained the identical offenses as §§ 841–843: § 501 outlawed drug dealing by those not "authorized" under the Act; § 502 prohibited, inter alia, actions by registrants which violated the "prescriptions" section;[20] and § 503 prohibited, inter alia, distribution by registrants in the absence of proper order forms. The relative severity of the penalties was also identical to the present Act: the most severe penalty was for vi-

15. 38 Stat. 785. Sections of the Harrison Act referred to in the opinion are reproduced in Appendix II, infra.

16. The government cites cases such as United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1921) ; United States v. Doremus, 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493 (1919) ; Linder v. United States, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819 (1925). See Appellee's Brief at 61–63.

17. 254 U.S. 189, 194, 41 S.Ct. 98, 100, 65 L.Ed. 214 (1920).

18. Appellee's Brief at 23.

19. S. 3246, 91st Cong., 2d Sess. (1970), is reproduced at 116 Cong.Rec. 1671 (1970). Relevant portions of §§ 501–503 of the Senate bill are reproduced in Appendix III infra.

20. See also § 309 of the Senate bill, detailing requirements for prescriptions, reproduced in Appendix III infra. Its language is comparable to the current language in 21 U.S.C. § 829.

olation of § 501, the least severe for violation of § 502.

The Judiciary Committee's Report on the Senate bill states that while § 501 applies to "traffickers," [21] § 502 contains "penalties . . . for those involved in the legitimate drug trade," [22] and § 503 contains "further penalties . . . for registrants for illegal distribution of [controlled] drugs . . ." [23] The Section-By-Section Analysis in the Report states that § 502 makes it unlawful to prescribe a controlled substance "contrary to the terms of registration requirements," [24] and § 503 makes it unlawful to distribute controlled substances "contrary to registration requirements and contrary to order forms established by the Attorney General." [25]

Thus it was clear at the time of the Senate Report that §§ 502–503 (§§ 842–843) were designed to regulate registrants—those within the legitimate drug business—while § 501 (§ 841) was for those outside of legitimate channels. The debtate on the floor of the Senate confirms this view. Senator Dodd, the manager of the bill and chairman of the relevant subcommittee, noted that §§ 502–503 provided penalties "for those involved in the legitimate drug trade." [26] Senator Hruska, a leading proponent of the bill and a member of Senator Dodd's subcommittee, emphasized that the Harrison Act was outdated. [27] He explained that in the Senate bill "we are not merely redecorating the existing legal structure. Rather we have laid a new foundation . . ." [28] Senator Hruska further noted that in the Senate bill "the penalties are tailored to fit the crime and the person who committed that crime." [29] He described § 501 as applying to "traffickers," [30] and §§ 502 and 503 as defining "offenses committed by registrants." [31]

On January 28, 1970, the Controlled Dangerous Substances Act passed the Senate. The House then held hearings in the field. On September 10, 1970, the House Committee on Interstate and Foreign Commerce reported out the bill which became the present Act.[32] The three penalty provisions passed by the

21. S.Rep. No. 91–613, 91st Cong., 1st Sess. 8 (1969). The penalty described establishes that § 501 is under discussion. This method of identification is used when necessary in the discussion of legislative history which follows.

22. *Id.* at 9.

23. *Id.*

24. *Id.* at 25.

25. *Id.*

26. 116 Cong.Rec. 997 (1970) (remarks of Senator Dodd).

Senator Dodd was chairman of the Juvenile Delinquency Subcommittee of the Judiciary Committee—the subcommittee that held hearings on narcotics legislation.

27. *Id.* at 975 (remarks of Senator Hruska):
Insofar as the enforcement of the drug laws of America are concerned, as they exist now, we know that basically the sanctions and penalties for the illegal acts are pretty much based on a law that is almost 60 years old, the Harrison Narcotic Act.

In the tenure of both the Senator from Connecticut and this Senator we have witnessed various amendments that have been made to that basic law, particularly in the field of penalties and penology, as well as some new substances. These were very unsatisfactory. It must be brought up to date, and it has to be modernized to include many new substances and substances considered dangerous and not yet in use, which will develop as time goes on. Then, there must be some scheme or system of penalties for those who do not obey regulations and the requirements of the statute and other things covered in the bill.

Other features in the bill would include distribution, dispensing, importation, exportation, as well as administrative provisions and enforcement provisions. We have to have most of these things, virtually all of them in order to write an immediate and effective law enforcement statute.

28. *Id.* at 1663.

29. *Id.* at 1664.

30. *Id.* at 1665.

31. *Id.*

32. H.R.Rep. No. 91–1444, *supra*, U.S.Code Cong. & Admin.News 1970, p. 4566.

Senate were retained in the House bill.[33] The House Committee's Report emphasized the unique structure of the proposed legislation:

> The bill provides for control by the Justice Department of problems related to drug abuse through registration of manufacturers, wholesalers, retailers, and all others in the legitimate distribution chain, and makes transactions outside the legitimate chain illegal.[34]

Thus the House Committee was aware, as the Senate was, of a distinction between § 841, which covers unauthorized individuals, and §§ 842 and 843, which cover those in the "legitimate distribution chain." The House Report notes that "more or less technical violations" are set forth in § 842 [35]—there is no comparable explanatory phrase concerning § 841 or § 843. We find no merit in the government's view that this phrase mandates that appellant be tried under § 841 since his violations were not "technical." At most, the phrase might indicate that § 843, which has more severe penalties than § 842, be used for certain serious offenses committed by those within the legitimate distribution chain. In any event, the phrase "more or less technical violations" is hardly self-explanatory—the penalty for a knowing violation of § 842 includes a year imprisonment, implying that Congress was concerned with serious misbehavior.[36]

The House Report provides further support for the view that the Controlled Substance Act fundamentally revises the penalty structure of the Harrison Act. The Report, in its discussion of the need for medical treatment for narcotics addicts,[37] cites with approval the reports of two Presidential Commissions—the Prettyman Commission of 1963 [38] and the Katzenbach Commission of 1967.[39] Both Commissions noted the difficulties physicians faced under the Harrison Act, where a controversial drug prescription for a patient could result in a doctor being punished as a pusher.[40] The House Report quoted at length from the Prettyman Commission's discussion of this problem, including its references to the very line of cases relied on by the government in this appeal:

> Since the passage of the Harrison Act of 1914, the Federal narcotics laws have expressly permitted a physician to prescribe narcotic drugs for a patient in the course of "professional practice only" and for "legitimate medical uses" and "legitimate medical

---

33. In the House bill, H.R. 18583, they are numbered §§ 401, 402, and 403. *See* H.R. Rep. No. 91–1444, *supra* at 46–48, U.S.Code Cong. & Admin.News 1970, p. 4566. They are the same as the Senate provisions for purposes relevant to this appeal.

34. H.R.Rep. No. 91–1444, *supra* at 3, U.S. Code Cong. & Admin.News 1970, p. 4569.

35. *Id.* at 10–11, U.S.Code Cong. & Admin. News 1970, p. 4576. ("More or less technical violations set forth in section 402 [§ 842] of the bill are punishable by less severe penalties.")

36. After passage by the House, the bill returned to the Senate, where Senator Hruska expressly noted during floor debate that the penalty structure was the same as in the original Senate bill he had supported. 116 Cong.Rec. 3502–03 (remarks of Senator Hruska). The same penalty structure was retained as the bill went through conference, finally passed both Houses, and was signed by the President.

37. H.R.Rep. 91–1444, *supra* at 14–15, U.S. Code Cong. & Admin.News 1970, p. 4566.

38. The President's Advisory Commission on Narcotics and Drug Abuse, *id.* at 16.

39. President's Commission on Law Enforcement and Administration of Justice, *id.*

40. For the observations of the Katzenbach Commission, see Task Force Report, Narcotics and Drug Abuse, the President's Commission on Law Enforcement and Administration of Justice (1967), at 18–19:

> What limits does the law set on the right of a physician to prescribe or administer narcotic drugs to a narcotic addict? This short question raises issues that have been warmly debated for a long time—issues that are not resolved by reference to the general proposition that the statutory and regulatory measures for the control of narcotic drugs are not intended to interfere with the administration of such drugs in legitimate medical practice. . . .

purposes." Under this statutory language there is no doubt that a physician may prescribe narcotic drugs for a patient suffering acute pain or from a painful and incurable disease. But a controversy has existed for 50 years over the extent to which narcotic drugs may be administered to an addict solely because he is an addict.

During the first 10 years following enactment of the Harrison Act, the Supreme Court affirmed several convictions under the act involving the indiscriminate prescribing of narcotic drugs for addicts. In 1925, however, in Linder v. United States, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819, the Court indicated that the dispensing of narcotic drugs by a physician for the purpose of relieving conditions incident to addiction was not in every instance a violation of the act. . . .

The regulations of the Bureau of Narcotics, however, do not seem to be in accord with [Linder] . . .

The practicing physician has thus been confused as to when he may prescribe narcotic drugs for an addict. Out of a fear of prosecution many physicians refuse to use narcotics in the treatment of addicts except occasionally in a withdrawal regimen lasting no longer than a few weeks. In most instances they shun addicts as patients.[41]

We are aware, as the dissent notes,[42] that this passage appears in the House Report's consideration of a section of the Act which provides for the determination of "appropriate methods of treatment for addicts" in order to "clarify for the medical profession in the United States the extent to which they may safely go in treating narcotic addicts as patients."[43] Yet the publication of acceptable methods, as one response to the impact of the *Linder* holding, does not exclude the implementation of other responses as well, including the exemption of registered practitioners from some penalty provisions. In any event, the general concern of Congress expressed here, taken together with the other aspects of the Act's legislative history which we have reviewed, forcibly undermines the Government's position that precedents under the Harrison Act should be considered "analogously dispositive." [44]

Reversed.

### APPENDIX I

Selected Provisions of the Controlled Substances Act of 1970, 21 U.S.C. § 801 et seq.

§ 802. Definitions.

(10) The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling, or compounding necessary to prepare the substance for such delivery. The term "dispenser" means a practitioner who so de-

---

41. H.Rep. No. 91–1444, *supra* at 14–15, U.S. Code Cong. & Admin.News 1970, p. 4580.

42. *See* p. 455 infra.

43. 42 U.S.C. § 257a (1970).

44. The Government also relies, by way of judicial authority, on three decisions in other circuits in conflict with our holding here. The first of these is United States v. Bartee, 479 F.2d 484 (10th Cir. 1973), wherein § 841 was held to apply to a licensed physician found to be in violation of § 829 and the regulations thereunder. The court's reasoning rested on an agreement between the parties that "the provisions exempting medical practitioners are found in 21 U.S.C. § 829 (a) and (b) and 21 C.F.R. § 306.04." *Id.* at 488. The court therefore never considered the effect of § 822, providing for the registration of dispensing physicians, which is the cornerstone of appellant's claim of exemption in this case. The later cases of United States v. Jobe, 487 F.2d 268 (10th Cir. 1973), and United States v. Leigh, 487 F.2d 206 (5th Cir. 1973), rely solely upon *Bartee.* As we respond to a line of reasoning which was not explored in any of these cases, we do not consider them persuasive authority.

livers a controlled substance to an ultimate user or research subject.

§ 812. Schedules of controlled substances.

(a) Establishment.

There are established five schedules of controlled substances, to be known as schedules I, II, III, IV, and V. Such schedules shall initially consist of the substances listed in this section. The schedules established by this section shall be updated and republished on a semiannual basis during the two-year period beginning one year after the date of enactment of this subchapter and shall be updated and republished on an annual basis thereafter.

(b) Placement on schedules; findings required.

Except where control is required by United States obligations under an international treaty, convention, or protocol in effect on the effective date of this part, and except in the case of an immediate precursor, a drug or other substance may not be placed in any schedule unless the findings required for such schedule are made with respect to such drug or other substance. The findings required for each of the schedules are as follows:

.    .    .    .    .    .

(2) SCHEDULE II.—

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

(C) Abuse of the drug or other substances may lead to sever psychological or physical dependence.

.    .    .    .    .    .

(c) Initial schedules of controlled substances.

Schedules I, II, III, IV, and V shall, unless and until amended pursuant to section 811 of this title, consist of the following drugs or other substances, by whatever official name, common or usual name, chemical name, or brand name designated:

.    .    .    .    .

## SCHEDULE II

(a) Unless specifically excepted or unless listed in another schedule, any of the following substances whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

(1) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate.

(2) Any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clause (1), except that these substances shall not include the isoquinoline alkaloids of opium.

(3) Opium poppy and poppy straw.

(4) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

(b) Unless specifically excepted or unless listed in another schedule, any of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, esters and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible within the specific chemical designation:

(1) Alphaprodine.
(2) Anileridine.
(3) Bezitramide.
(4) Dihydrocodeine.
(5) Diphenoxylate.

(6) Fentanyl.

(7) Isomethadone.

(8) Levomethorphan.

(9) Levorphanol.

(10) Metazocine.

(11) Methadone.

(12) Methadone - Intermediate, 4-cyano-2-dimethylamino-4, 4-diphenyl butane.

(13) Moramide-Intermediate, 2-methyl - 3 - morpholino - 1,1 - diphenylpropane-carboxylic acid.

(14) Pethidine.

(15) Pethidine - Intermediate - A, 4-cyano-1-methyl-4-phenylpiperidine.

(16) Pethidine-Intermediate-B, ethyl - 4 - phenylpiperidine - 4 - carboxylate.

(17) Pethidine-Intermediate-C, 1 - methyl - 4 - phenylpiperidine - 4 - carboxylic acid.

(18) Phenazocine.

(19) Piminodine.

(20) Racemethorphan.

(21) Racemorphan.

(c) Unless specifically excepted or unless listed in another schedule, any injectable liquid which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers.

§ 821. Rules and regulations.

The Attorney General is authorized to promulgate rules and regulations and to charge reasonable fees relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances.

§ 822. Persons required to register.

(a) Annual registration.

Every person who manufactures, distributes, or dispenses any controlled substance or who proposes to engage in the manufacture, distribution, or dispensing of any controlled substance, shall obtain annually a registration issued by the Attorney General in accordance with the rules and regulations promulgated by him.

(b) Authorized activities.

Persons registered by the Attorney General under this subchapter to manufacture, distribute, or dispense controlled substances are authorized to possess, manufacture, distribute, or dispense such substances (including any such activity in the conduct of research) to the extent authorized by their registration and in conformity with the other provisions of this subchapter.

(c) Exceptions.

The following persons shall not be required to register and may lawfully possess any controlled substance under this subchapter:

(1) An agent or employee of any registered manufacturer, distributor, or dispenser of any controlled substance if such agent or employee is acting in the usual course of his business or employment.

(2) A common or contract carrier or warehouseman, or an employee thereof, whose possession of the controlled substance is in the usual course of his business or employment.

(3) An ultimate user who possesses such substance for a purpose specified in section 802(25) of this title.

(d) Waiver.

The Attorney General may, by regulation, waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety.

(e) Separate registration.

A separate registration shall be required at each principal place of business or professional practice where the applicant manufactures, distributes, or dispenses controlled substances.

(f) Inspection.

The Attorney General is authorized to inspect the establishment of a registrant or applicant for registration in accordance with the rules and regulations pro-

mulgated by him. Pub.L. 91–513, title II, § 302, Oct. 27, 1970, 84 Stat. 1253.

§ 824. Denial, revocation, or suspension of registrations.

(a) Grounds.

A registration pursuant to section 823 of this title to manufacture, distribute, or dispense a controlled substance may be suspended or revoked by the Attorney General upon a finding that the registrant—

(1) has materially falsified any application filed pursuant to or required by this subchapter or subchapter II of this chapter;

(2) has been convicted of a felony under this subchapter or subchapter II of this chapter or any other law of the United States, or of any State, relating to any substance defined in this subchapter as a controlled substance; or

(3) has had his State license or registration suspended, revoked, or denied by competent State authority and is no longer authorized by State law to engage in the manufacturing, distribution, or dispensing of controlled substances.

(b) Limits of revocation or suspension.

The Attorney General may limit revocation or suspension of a registration to the particular controlled substance with respect to which grounds for revocation or suspension exist.

(c) Service of show cause order; proceedings.

Before taking action pursuant to this section, or pursuant to a denial of registration under section 823 of this title, the Attorney General shall serve upon the applicant or registrant an order to show cause why registration should not be denied, revoked, or suspended. The order to show cause shall contain a statement of the basis thereof and shall call upon the applicant or registrant to appear before the Attorney General at a time and place stated in the order, but in no event less than thirty days after the date of receipt of the order. Proceedings to deny, revoke, or suspend shall be conducted pursuant to this section in accordance with subchapter II of chapter 5 of Title 5. Such proceedings shall be independent of, and not in lieu of, criminal prosecutions or other proceedings under this subchapter or any other law of the United States.

(d) Suspension of registration in cases of imminent danger.

The Attorney General may, in his discretion, suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an imminent danger to the public health or safety. Such suspension shall continue in effect until the conclusion of such proceedings, including judicial review thereof, unless sooner withdrawn by the Attorney General or dissolved by a court of competent jurisdiction.

§ 828. Order forms.

(a) Unlawful distribution of controlled substances.

It shall be unlawful for any person to distribute a controlled substance in schedule I or II to another except in pursuance of a written order of the person to whom such substance is distributed, made on a form to be issued by the Attorney General in blank in accordance with subsection (d) of this section and regulations prescribed by him pursuant to this section.

(b) Nonapplicability of provisions.

Nothing in subsection (a) of this section shall apply to—

(1) the exportation of such substances from the United States in conformity with subchapter II of this chapter;

(2) the delivery of such a substance to or by a common or contract carrier for carriage in the lawful and usual course of its business, or to or by a warehouseman for storage in the lawful and usual course of its business; but where such carriage or storage is in connection with the distribution by the owner of the substance to a third

person, this paragraph shall not relieve the distributor from compliance with subsection (a) of this section.

(c) Preservation and availability.

(1) Every person who in pursuance of an order required under subsection (a) of this section distributes a controlled substance shall preserve such order for a period of two years, and shall make such order available for inspection and copying by officers and employees of the United States duly authorized for that purpose by the Attorney General, and by officers or employees of States or their political subdivisions who are charged with the enforcement of State or local laws regulating the production, or regulating the distribution or dispensing, of controlled substances and who are authorized under such laws to inspect such orders.

(2) Every person who gives an order required under subsection (a) of this section shall, at or before the time of giving such order, make or cause to be made a duplicate thereof on a form to be issued by the Attorney General in blank in accordance with subsection (d) of this section and regulations prescribed by him pursuant to this section, and shall, if such order is accepted, preserve such duplicate for a period of two years and make it available for inspection and copying by the officers and employees mentioned in paragraph (1) of this subsection.

(d) Issuance.

(1) The Attorney General shall issue forms pursuant to subsections (a) and (c)(2) of this section only to persons validly registered under section 823 of this title (or exempted from registration under section 822(d) of this title). Whenever any such form is issued to a person, the Attorney General shall, before delivery thereof, insert therein the name of such person, and it shall be unlawful for any other person (A) to use such form for the purpose of obtaining controlled substances or (B) to furnish such form to any person with intent thereby to procure the distribution of such substances.

(e) Unlawful acts.

(2) The Attorney General may charge reasonable fees for the issuance of such forms in such amounts as he may prescribe for the purpose of covering the cost to the United States of issuing such forms, and other necessary activities in connection therewith.

It shall be unlawful for any person to obtain by means of order forms issued under this section controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of his professional practice or research.

§ 829. Prescriptions.

(a) Schedule II substances.

Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule II, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without the written prescription of a practitioner, except that in emergency situations, as prescribed by the Secretary by regulation after consultation with the Attorney General, such drug may be dispensed upon oral prescription in accordance with section 353(b) of this title. Prescriptions shall be retained in conformity with the requirements of section 827 of this title. No prescription for a controlled substance in schedule II may be refilled.

(b) Schedule III and IV substances.

Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule III or IV, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without a written or oral prescription in conformity with section 353(b) of this title. Such prescriptions may not be filled or refilled more than six months after the date thereof or be refilled more than five times after

the date of the prescription unless renewed by the practitioner.

(c) Schedule V substances.

No controlled substance in schedule V which is a drug may be distributed or dispensed other than for a medical purpose.

(d) Non-prescription drugs with abuse potential.

Whenever it appears to the Attorney General that a drug not considered to be a prescription drug under the Federal Food, Drug, and Cosmetic Act should be so considered because of its abuse potential, he shall so advise the Secretary and furnish to him all available data relevant thereto.

§ 841. Prohibited acts A.

(a) Unlawful acts.

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

(b) Penalties.

Except as otherwise provided in section 845 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

(1)(A) In the case of a controlled substance in schedule I or II which is a narcotic drug, such person shall be sentenced to a term of imprisonment of not more than 15 years, a fine of not more than $25,000, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 30 years, a fine of not more than $50,000, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a special parole term of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a special parole term of at least 6 years in addition to such term of imprisonment.

(B) In the case of a controlled substance in schedule I or II which is not a narcotic drug or in the case of any controlled substance in schedule III, such person shall be sentenced to a term of imprisonment of not more than 5 years, a fine of not more than $15,000, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 10 years, a fine of not more than $30,000, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a special parole term of at least 2 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a special parole term of at least 4 years in addition to such term of imprisonment.

(2) In the case of a controlled substance in schedule IV, such person shall be sentenced to a term of imprisonment of not more than 3 years, a fine of not more than $10,000, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such per-

son shall be sentenced to a term of imprisonment of not more than 6 years, a fine of not more than $20,000, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a special parole term of at least one year in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a special parole term of at least 2 years in addition to such term of imprisonment.

(3) In the case of a controlled substance in schedule V, such person shall be sentenced to a term of imprisonment of not more than one year, a fine of not more than $5,000, or both. If any person commits such a violation after one or more convictions of him for an offense punishable under this paragraph, or for a crime under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 2 years, a fine of not more than $10,000, or both.

(4) Notwithstanding paragraph (1) (B) of this subsection, any person who violates subsection (a) of this section by distributing a small amount of marihuana for no remuneration shall be treated as provided in subsections (a) and (b) of section 844 of this title.

§ 842.   Prohibited Acts B.

(a) Unlawful acts.

It shall be unlawful for any person—

(1) who is subject to the requirements of part C to distribute or dispense a controlled substance in violation of section 829 of this title;

(2) who is a registrant to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person or to manufacture a controlled substance not authorized by his registration;

(3) who is a registrant to distribute a controlled substance in violation of section 825 of this title;

(4) to remove, alter, or obliterate a symbol or label required by section 825 of this title;

(5) to refuse or fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this subchapter or subchapter II of this chapter;

(6) to refuse any entry into any premises or inspection authorized by this subchapter or subchapter II of this chapter;

(7) to remove, break, injure, or deface a seal placed upon controlled substances pursuant to section 824(f) or 881 of this title or to remove or dispose of substances so placed under seal; or

(8) to use, to his own advantage, or to reveal, other than to duly authorized officers or employees of the United States, or to the courts when relevant in any judicial proceeding under this subchapter or subchapter II of this chapter, any information acquired in the course of an inspection authorized by this subchapter concerning any method or process which as a trade secret is entitled to protection.

(b) Manufacture.

It shall be unlawful for any person who is a registrant to manufacture a controlled substance in schedule I or II which is—

(1) not expressly authorized by his registration and by a quota assigned to him pursuant to section 826 of this title; or

(2) in excess of a quota assigned him pursuant to section 826 of this title.

(c) Penalties.

(1)   Except as provided in paragraph (2), any person who violates this section shall, with respect to any such violation, be subject to a civil penalty of not more

than $25,000. The district courts of the United States (or, where there is no such court in the case of any territory or possession of the United States, then the court in such territory or possession having the jurisdiction of a district court of the United States in cases arising under the Constitution and laws of the United States) shall have jurisdiction in accordance with section 1355 of Title 28 to enforce this paragraph.

(2)(A) If a violation of this section is prosecuted by an information or indictment which alleges that the violation was committed knowingly and the trier of fact specifically finds that the violation was so committed, such person shall, except as otherwise provided in subparagraph (B) of this paragraph, be sentenced to imprisonment of not more than one year or a fine of not more than $25,000 or both.

(B) If a violation referred to in subparagraph (A) was committed after one or more prior convictions of the offender for an offense punishable under this paragraph (2), or for a crime under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 2 years, a fine of $50,000, or both.

(3) Except under the conditions specified in paragraph (2) of this subsection, a violation of this section does not constitute a crime, and a judgment for the United States and imposition of a civil penalty pursuant to paragraph (1) shall not give rise to any disability or legal disadvantage based on conviction for a criminal offense.

§ 843. Prohibited Acts C.

(a) Unlawful acts.

It shall be unlawful for any person knowingly or intentionally—

(1) who is a registrant to distribute a controlled substance classified in schedule I or II, in the course of his legitimate business, except pursuant to an order or an order form as required by section 828 of this title;

(2) to use in the course of the manufacture or distribution of a controlled substance a registration number which is fictitious, revoked, suspended, or issued to another person;

(3) to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge;

(4) to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this subchapter or subchapter II of this chapter; or

(5) to make, distribute, or possess any punch, die, plate, stone, or other thing designed to print, imprint, or reproduce the trademark, trade name, or other identifying mark, imprint, or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit substance.

(b) Communication facility.

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

(c) Penalties.

Any person who violates this section shall be sentenced to a term of imprisonment of not more than 4 years, a fine of not more than $30,000, or both; except that if any person commits such a viola-

tion after one or more prior convictions of him for violation of this section, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 8 years, a fine of not more than $60,000, or both.

## APPENDIX II

Selected Provisions of the Harrison Act
38 Stat. 785

SEC. 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That on and after the first day of March, nineteen hundred and fifteen, every person who produces, imports, manufactures, compounds, deals in, dispenses, sells, distributes, or gives away opium or coca leaves or any compound, manufacture, salt, derivative, or preparation thereof, shall register with the collector of internal revenue of the district his name or style, place of business, and place or places where such business is to be carried on: *Provided,* That the office, or if none, then the residence of any person shall be considered for the purposes of this Act to be his place of business. At the time of such registry and on or before the first day of July, annually thereafter, every person who produces, imports, manufactures, compounds, deals in, dispenses, sells, distributes, or gives away any of the aforesaid drugs shall pay to the said collector a special tax at the rate of $1 per annum . . .

SEC. 2. That it shall be unlawful for any person to sell, barter, exchange, or give away any of the aforesaid drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Commissioner of Internal Revenue. Every person who shall accept any such order, and in pursuance thereof shall sell, barter, exchange, or give away

any of the aforesaid drugs, shall preserve such order for a period of two years in such a way as to be readily accessible to inspection by any officer, agent, or employee of the Treasury Department duly authorized for that purpose, and the State, Territorial, District, municipal, and insular officials named in section five of this Act. Every person who shall give an order as herein provided to any other person for any of the aforesaid drugs shall, at or before the time of giving such order, make or cause to be made a duplicate thereof on a form to be issued in blank for that purpose by the Commissioner of Internal Revenue, and in case of the acceptance of such order, shall preserve such duplicate for said period of two years in such a way as to be readily accessible to inspection by the officers, agents, employees, and officials hereinbefore mentioned. Nothing contained in this section shall apply—

(a) To the dispensing or distribution of any of the aforesaid drugs to a patient by a physician, dentist, or veterinary surgeon registered under this Act in the course of his professional practice only: *Provided,* That such physician, dentist, or veterinary surgeon shall keep a record of all such drugs dispensed or distributed, showing the amount dispensed or distributed, the date, and the name and address of the patient to whom such drugs are dispensed or distributed, except such as may be dispensed or distributed to a patient upon whom such physician, dentist or veterinary surgeon shall personally attend; and such record shall be kept for a period of two years from the date of dispensing or distributing such drugs, subject to inspection, as provided in this Act.

(b) To the sale, dispensing, or distribution of any of the aforesaid drugs by a dealer to a consumer under and in pursuance of a written prescription issued by physician, dentist, or veterinary surgeon registered under this Act: *Provided, however,* That such prescription shall be dated as of the day on which

signed and shall be signed by the physician, dentist, or veterinary surgeon who shall have issued the same: *And provided further,* That such dealer shall preserve such prescription for a period of two years from the day on which such prescription is filled in such a way as to be readily accessible to inspection by the officers, agents, employees, and officials hereinbefore mentioned.

SEC. 9. That any person who violates or fails to comply with any of the requirements of this Act shall, on conviction, be fined not more than $2,000 or be imprisoned not more than five years, or both, in the discretion of the court.

## APPENDIX III

Selected Provisions of S.3246, 91st Cong., 2d Sess.

### PRESCRIPTIONS

SEC. 309. (a) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled dangerous substance included in schedule II, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without the written prescription of a practitioner: *Provided,* That in emergency situations, as prescribed by the Attorney General by regulation such drug may be dispensed upon oral prescription in accordance with section 503(b) of that Act. Prescriptions shall be retained in conformity with the requirements of section 307 of this Act. No prescription for a schedule II substance may be refilled.

(b) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled dangerous substance included in schedule III which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without a written or oral prescription to conformity with section 503(b) of that Act. Such prescription may not be filled or refilled more than six months after the date thereof or be refilled more than five times after the

date of the prescription unless renewed by the practitioner.

(c) No controlled dangerous substance included in schedule IV may be distributed or dispensed other than for a medical purpose.

(d) Whenever it appears to the Attorney General that a drug not considered to be a prescription drug under the Federal Food, Drug, and Cosmetic Act should be so considered because of its abuse potential, he shall so advise the Secretary of Health, Education, and Welfare and furnish to him all available data relevant thereto.

### PROHIBITED ACTS A—PENALTIES

SEC. 501. (a) Except as authorized by this Act, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled dangerous substance:

\*   \*   \*   \*   \*   \*

(c) Any person who violates subsection (a) or (b) with respect to—

(1) a substance classified in schedules I or II which is a narcotic drug shall be sentenced to a term of imprisonment for not more than twelve years, a fine of not more than $25,000, or both. In addition to any term of imprisonment, any sentence imposed shall include a special parole term of at least three years.

\*   \*   \*   \*   \*   \*

### PROHIBITED ACTS B—PENALTIES

SEC. 502. (a) It shall be unlawful for any person—

(1) who is subject to the requirements of title II of this Act to distribute or dispense a controlled dangerous substance in violation of section 309 [prescriptions];

(2) who is a registrant to manufacture, distribute, or dispense a controlled dangerous substance not authorized by his registration to another registrant or other authorized person;

(3) to bring a controlled dangerous substance classified in schedule I, II, or

III into the United States or the special maritime or territorial jurisdiction of the United States for transhipment to another country, or to transfer or tranship such a substance from one vessel to another within the United States for immediate exportation or for any other purpose—in violation of section 404 of this Act;

(4) who is a registrant to omit from any container of a controlled dangerous substance the symbol required by section 305 of this Act;

(5) to remove, alter, or obliterate a symbol required by section 305 of this Act;

(6) to refuse or fail to make, keep, or furnish any record, report, notification, order form, statement, invoice, or information required under this Act; or

(7) to refuse any entry into any premises or inspection authorized by this Act.

(b) It shall be lawful for any person who is a registrant to manufacture a controlled dangerous substance which is—

(1) not expressly authorized by his registration and by a quota assigned to him pursuant to section 306 of this Act; or

(2) in excess of a quota assigned to him pursuant to section 306 of this Act.

(c) Any person who violates this section is punishable by a civil fine of not more than $25,000: *Provided,* That if the violation is prosecuted by an information or indictment which alleges that the violation was committed knowingly or intentionally, and the trier of fact specifically finds that the violation was committed knowingly or intentionally, such person is punishable by imprisonment for not more than one year, or a fine of not more than $25,000, or both.

### PROHIBITED ACTS C—PENALTIES

SEC. 503. (a) It shall be unlawful for any person knowingly or intentionally—

(1) who is a registrant to distribute a controlled dangerous substance classified in schedule I or II, in the course of his legitimate business, except pursuant to an order form as required by section 308 of this Act;

(2) to use in the course of the manufacture or distribution of a controlled dangerous substance a registration number which is fictitious, revoked, suspended, or issued to another person;

(3) to acquire or obtain possession of a controlled dangerous substance by misrepresentation, fraud, forgery, deception, or subterfuge;

(4) to furnish false or fraudulent material information in, or omit any material information from, any application, report, or other document required to be kept or filed under this Act, or any record required to be kept by this Act;

(5) to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting an offense under any provision of this Act. Each separate use of a communication facility shall be a separate offense under this section. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds; it includes mail, telephone, wire, radio, and all other means of communications; and,

(6) to make, distribute, or possess any punch, die, plate, stone, or other thing designed to print, imprint, or reproduce the trademark, trade name, or other identifying mark, imprint, or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit controlled dangerous substance.

(b) Any person who violates this section is punishable by imprisonment for not more than three years, a fine of not more than $30,000, or both.

MacKINNON, Circuit Judge, dissenting:

The majority today reverses the conviction of a medical doctor, clearly prov-

en to be a drug pusher (trafficker), on the ground that he was prosecuted under the wrong section of the Controlled Substances Act. They reach this result despite the fact that the section is aimed at drug pushers and "traffickers," which Dr. Moore clearly was. The majority holds that the authorization of a doctor to dispense controlled substances for legitimate medical purposes absolutely immunizes him from prosecution under section 401(a) of the Act, 21 U.S.C. § 841(a) (1970), even when he dispenses narcotic drugs clearly for illegitimate purposes. The majority thus holds that Congress intended to exempt trafficking doctors, merely because they were doctors, from the penalties applicable to other traffickers. The fatal defect in this holding is the failure to recognize that the provision of section 401(a) which excepts authorized conduct does not create a special class of *persons* immune from prosecution for trafficking; rather, it recognizes the legality of the *acts and conduct* of a physician when he dispenses a narcotic drug in good faith for a legitimate medical purpose consistent with the terms of his registration under the Act. The remainder of this opinion points out that the terms of the Act, its prior and subsequent legislative history, and plain common sense demonstrate the fallacy of the majority's approach to this case. I therefore respectfully dissent.

I

Dr. Moore, a physician registered under the Act to dispense methadone for detoxification purposes,[1] was charged in a 639-count indictment[2] filed June 27, 1972, with the knowing and unlawful distribution and dispensation of methadone (dolophine), a Schedule II narcotic drug controlled substance,[3] in violation of section 401(a), 21 U.S.C. § 841(a) (1970). Dr. Moore was tried by jury on a retyped indictment containing thirty-eight counts of the original indictment and was convicted on twenty-two of those counts.[4] He was sentenced to concurrent prison terms of five to fifteen years on fourteen counts, and ten to

---

1. Tr. at 711–12. Methadone detoxification is a currently accepted medical practice designed to cure a narcotic addict of his addiction. It involves initially a "holding stage" in which the methadone dosage necessary to prevent withdrawal symptoms is determined, after which such dosage is gradually reduced until the patient hopefully reaches a drug-free state. *See* text as 447–448 *infra*.

The Controlled Substances Act was recently amended to include a specific definition of detoxification for purposes of the Act:

The term 'detoxification treatment means the dispensing, for a period not in excess of twenty-one days, of a narcotic drug in decreasing doses to an individual in order to alleviate adverse physiological or psychological effects incident to withdrawal from the continuous or sustained use of a narcotic drug and as a method of bringing the individual to a narcotic drug-free state within such period.

Narcotic Addict Treatment Act of 1974 § 2, Pub.L. No. 93–281 (May 14, 1974), 88 Stat. 124.

2. Count one of the indictment is typical of the grand jury charges:

On or about the dates hereinafter specified for each count, THOMAS W. MOORE, JR., the defendant herein, within the District of Columbia, knowingly and unlawfully distributed and dispensed the hereinafter specified amounts of 10 milligram dolophine tablets, a Schedule II, narcotic drug controlled substance to, Bobby J. King, as follows: [etc.].

3. Schedule II.—

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

(C) Abuse of the. drug or other substances may lead to severe psychological or physical dependence.

Act, § 202(b)(2), 21 U.S.C. § 812(b)(2).

4. At the suggestion of the district court, the original indictment was pared to forty counts; the Government dismissed two counts at the close of its case and the case finally was submitted to the jury on the thirty-eight remaining counts. All other counts of the original 639-count indictment were dismissed by the Government (Tr. at 1002). Dr. Moore was convicted as to all but one of the nine persons named in the indictment as recipients of the illegally dispensed methadone.

thirty years on the remaining eight counts, to run concurrently with each other but consecutively to the other sentences. He was fined a total of $150,000, a special parole term of twelve years was imposed on each count, to run concurrently as to all counts, and his license to practice medicine in the District of Columbia was revoked pursuant to D.C.Code § 2–131.

The conditions at Dr. Moore's office are indicative of what transpired there and place his dispensing of methadone and his "treatment" of narcotic addicts in perspective. For example, the Doctor employed two armed guards at his office, one of whom carried a .38 caliber pistol which he kept beside him or in his belt, a loaded shotgun, held in both hands with the muzzle pointed upwards (Tr. at 374), and a blackjack (Tr. at 376). The other guard, stationed in the hallway, carried a .45 caliber handgun which he held at the ready in his hand (Tr. at 375). Dr. Moore had a German shepherd dog which sat beside him on the floor in his inner office (Tr. at 376), and on at least one occasion he had a .22 caliber handgun on his desk (Tr. at 129). On another occasion a patient was standing in the hallway outside the office and was told by a guard to move. When he did not respond, "fists [started] flying," and the guard "knocked him down the steps" and out of the office (Tr. at 130–32).

It is unnecessary to recount here the testimony of all the witnesses for the Government which established beyond any doubt the illegal activity of Dr. Moore, since it was substantially cumulative. Rather, the general pattern that emerges from the evidence is detailed and then several representative case histories are discussed.

On a patient's first visit to Dr. Moore's office a nurse would request identification, give the patient several forms to complete, take his weight, height and blood pressure, and request an unsupervised urine specimen. After standing in line for one or two hours with up to 100 other patients, he would finally see Dr. Moore. Moore would ask the patient to display track marks and then ask what he could do for him. The patient would ask for a prescription for dolophine pills. Moore would inform the patient that a prescription for 50 pills was $15, 75 pills for $25, 100 pills for $35 and 150 pills for $50. The patient generally would request and invariably receive a prescription for as many pills as he could afford.

Appointments were never required and return visits followed the same general pattern as initial visits but without any physical examination. The established pattern on return visits was as follows:

I would go in there, the secretary would take my name; and she would put my folder out and put it in line, you know; on top of the other ones; and when it was my turn, he would call me in the office . . . . (Tr. II 285.)

\* \* \* \* \* \*

He would ask how many I wanted, and 50, 75 or a hundred, he told me the price; and I told him how much I wanted; and I paid him. (Tr. II 265.)

Each witness was able to procure a prescription for any number of dolophine pills for which he had sufficient cash on hand. Moore generally did not inquire about the daily dosages of his patients and did not give directions as to their proper use.

Bobby James King, a twenty-two year old student at Howard University (Tr. at 57), first went to Dr. Moore with a friend who had visited Moore before. The friend obtained the pills which they then shared, each paying half. He returned to Dr. Moore's on his own (Tr. at 60) because methadone "was cheaper [than heroin] and [he] could get high" (Tr. at 88). He went to Moore not for detoxification but only to procure as much methadone as possible from the Doctor (Tr. at 90–91), since he could get higher on methadone than on heroin (Tr. at 85).

The procedure King went through to join Dr. Moore's program included producing identification to prove he was twenty-one or over and giving an unsupervised urine specimen (Tr. at 61). Blood pressure may have been taken (Tr. at 61, 94–95) and height and weight noted, and finally King saw Dr. Moore, who examined his arms for track marks (Tr. at 63, 95). He then received a half bottle of liquid methadone and a prescription for dolophine pills. On subsequent visits the Doctor typically would ask, "What can I do for you?" and King would respond "100 pills or 50, depending upon the amount of money I had." (Tr. at 65, 113). After filling the prescription, King ingested a sufficient number of dolophines to get high and sold the rest on the street at $1.50 per pill (Tr. at 67). He began by taking two to three dolophines per day and at the end of his "detoxification" treatment his daily dosage was 30–35 dolophines. *Id.* On several occasions King visited Moore twice on one day and received his second prescription for the day without any questions asked (Tr. at 69). He finally quit methadone after Moore's office was closed down: "I just cold turkey kicked it." (Tr. at 78.)

Karen Bryan, a plain clothes policewoman with the Metropolitan Police Department assigned to undercover narcotics duty, visited the Doctor under an assumed name (Tr. at 133–35). She was not, of course, a narcotics user (Tr. at 136) but nonetheless was able to obtain prescriptions for dolophine pills from Moore. After the usual minimal examination she saw Moore for about three minutes, exhibited her "tracks," placed there in a police clinic, and Moore wrote a prescription for 50 dolophines. When leaving, Officer Bryan asked the nurse, "How much for a visit?", the nurse laughed and said, "nothing." (Tr. at 137–38.) On subsequent visits her conversations with Dr. Moore were limited to telling him how many pills she desired (Tr. at 139). Although her urinalysis was negative as to all types of narcotics (Tr. at 146), Moore never referred to the test results (Tr. at 141).

Forris Ensor went from 5 to 70 dolophines per day while under Dr. Moore's "detoxification" treatment program (Tr. at 171), but Moore never questioned him about the ever-increasing dosages (Tr. at 194). Roger Wheeler "just gave him the money and got the prescription" (Tr. at 200), always used the dolophines to get high (Tr. at 203) and bought as many as he could afford (Tr. at 200, 202). Ivan Gower was not examined for track marks (Tr. at 240); he asked Moore to detoxify him and Moore replied that he had too many patients and not enough time to attempt detoxification (Tr. at 231). William Burgee "doctored" his unsupervised urine specimen since he was not a narcotics addict (Tr. at 247), but simply purchased prescriptions for a friend (Tr. at 248). Moore never instructed his patients on the proper use of dolophine (Tr. at 254). Herbert Holland would see Moore just long enough to inform Moore of the amount of money he had available and obtain a prescription (Tr. at 286). John Mann initially was on seven dolophines daily, and at the end of detoxification treatment by Dr. Moore he was taking over 100 pills per day (Tr. at 310). James Frazier asked Moore how to detoxify and Moore said "you have to detox, you know, cut down, cut down," but Moore continued to give Frazier prescriptions for any amount of dolophines desired (Tr. at 323).

As established by expert medical testimony at trial, the above evidence conclusively demonstrates that Dr. Moore's detoxification treatment was not "consistent with any method . . . throughout the United States that is accepted by the medical profession in this country." (Tr. at 396, 447–50). Nothing in Dr. Moore's procedures would suggest a "new, effective, good-faith technique in the treatment, detoxificational cure of an addict." (Tr. at 474.) Moore's fee arrangement of increasing prices for a prescription based solely on the number

of dolophines prescribed was characterized by one medical expert as follows: "That is not only not acceptable medical practice; that is unethical medical practice." (Tr. at 452, 396–97.)

In contrast to Dr. Moore's procedures, accepted medical practice in the treatment of drug addicts dictates a complete, thorough physical examination (Tr. at 387, 447), not only to correctly diagnose their addiction but also because addicts generally are subject to other diseases that need treatment (Tr. at 447–48). The initial evaluation of a professed addict desiring treatment includes a determination as to (1) the fact of addiction, (2) the nature of the addiction, and (3) the nature of the underlying difficulties that led to addiction (Tr. at 386–87). After determining the daily dosage necessary to prevent withdrawal symptoms, detoxification begins by reducing that dosage by approximately 5–10 milligrams (the equivalent of $\frac{1}{2}$ to 1 dolophines) every three days (Tr. at 441, 443). The methadone is administered daily under direct staff supervision since addicts, especially in the early stages of detoxification, cannot be trusted (Tr. at 389–90, 445). After four to six weeks an addict who proves trustworthy may be given "weekend privileges," that is, two dosages to be taken without staff supervision (Tr. at 445).

Thus the evidence credited at trial by the jury conclusively establishes that Dr. Moore operated far beyond the pale of accepted medical practice. He clearly did not dispense methadone for detoxification purposes, but rather, quite simply, preyed upon the insatiable cravings of those unfortunate victims he purported to treat solely to get their money. In short, Moore was a drug pusher, a trafficker in illegal narcotics.[5]

## II

What sanction then, does the law impose on this drug pusher masquerading in the honorable profession of medicine? The majority opines that the manifest congressional intent is to prosecute drug-pushing doctors under a section reserved for "technical" violations, one that normally contemplates only *civil* penalties but which may result in misdemeanor penalties if the violation is done "knowingly" or more severe penalties if the offender is a repeater. This is facially absurd.

The basic criminal provisions of the Act impose sanctions for three types of illegal conduct. Section 401, 21 U.S.C. § 841, is aimed at drug pushers and traffickers in narcotics and thus provides the most severe penalties.[6] Section 402, 21 U.S.C. § 842, is a regulatory provision primarily aimed at "technical viola-

5. In effect Moore sold prescriptions for controlled drugs by the pill and that makes him a trafficker. He also increased the price per pill as the addict or individual requested larger numbers of pills. Thus, while his "price" for 50 pills was $15, or $7.50 for 25 pills, his price was $10 for each additional 25 pills after the first 50. Accordingly, the larger users had to pay a higher price per pill.

6. SEC. 401. (a) Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally—

    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

    (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

    (b) Except as otherwise provided in section 405, any person who violates subsec-

tion (a) of this section shall be sentenced as follows:

    (1)(A) In the case of a controlled substance in schedule I or II which is a narcotic drug, such person shall be sentenced to a term of imprisonment of not more than 15 years, a fine of not more than $25,000, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this title or title III or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 30 years, a fine of not more than $50,000, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a special parole

tions" and accordingly normally contemplates a civil rather than criminal penalty against violators; but where such violations are committed "knowingly,"

misdemeanor punishment may be imposed if prosecuted by indictment or information.[7] Repeat offenders may be subjected to greater punishment. Like

term of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a special parole term of at least 6 years in addition to such term of imprisonment.

(B) In the case of a controlled substance in schedule I or II which is not a narcotic drug or in t'e case of any controlled substance in schedule III, such person shall be sentenced to a term of imprisonment of not more than 5 years, a fine of not more than $15,000, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this title or title III or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 10 years, a fine of not more than $30,000, or bot'. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a special parole term of at least 2 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a special parole term of at least 4 years in addition to such term of imprisonment. Act § 401, 21 U.S.C. § 841 (1970).

7. SEC. 402. (a) It shall be unlawful for any person—

(1) who is subject to the requirements of part C to distribute or dispense a controlled substance in violation of section 309;

(2) who is a registrant to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person or to manufacture a controlled substance not authorized by l is registration;

(3) who is a registrant to distribute a controlled substance in violation of section 305 of this title;

(4) to remove, alter, or obliterate a symbol or label required by section 305 of this title;

(5) to refuse or fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this title or title III;

(6) to refuse any entry into any premises or inspection authorized by this title or title III;

(7) to remove, break, injure, or deface a seal placed upon controlled substances pursuant to section 304(f) or 511 or to remove or dispose of substances so placed under seal; or

(8) to use, to his own advantage, or to reveal, other than to duly authorized officers or employees of the United States, or to the courts when relevant in any judicial proceeding under this title or title III, any information acquired in the course of an inspection authorized by this title concerning any method or process whic'1 as a trade secret is entitled to protection.

(b) It shall be unlawful for any person who is a registrant to manufacture a controlled substance in schedule I or II which is—

(1) not expressly authorized by his registration and by a quota assigned to him pursuant to section 306; or

(2) in excess of a quota assigned to him pursuant to section 306.

(c)(1) Except as provided in paragraph (2), any person who violates this section shall, with respect to any such violation, be subject to a civil penalty of not more than $25,000. The district courts of the United States (or, where there is no such court in the case of any territory or possession of the United States, then the court in such territory or possession having the jurisdiction of a district court of the United States in cases arising under the Constitution and laws of the United States) shall have jurisdiction in accordance with section 1355 of title 28 of the United States Code to enforce this paragraph.

(2)(A) If a violation of this section is prosecuted by an information or indictment which alleges that t'.e violation was committed knowingly and the trier of fact specifically finds that the violation was so committed, such person shall, except as otherwise provided in subparagraph (B) of this paragraph, be sentenced to imprisonment of not more than one year or a fine of not more than $25,000, or both.

(B) If a violation referred to in subparagraph (A) was committed after one or more prior convictions of the offender for an offense punishable under this paragraph (2), or for a crime under any other provision of this title or title III or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of im-

section 402, section 403, 21 U.S.C. § 843, includes a number of regulatory provisions (some applicable to registrants) but provides more severe sanctions than section 402, and also prohibits the use of communication facilities in the commission of any offense.[8]

Section 401(a) provides:

*Except as authorized* by this title, it shall be unlawful for *any* person knowingly or intentionally—

(1) to manufacture, distribute, or dispense . . . a controlled substance . . . .

21 U.S.C. § 841(a) (emphasis added). From a "plain language" perspective two things are immediately clear: (1) section 401(a) in terms applies to *"any person"* and (2) the exception does not state "except for registrants," but rather, "except as authorized." There is thus no expressed intent in the language of section 401(a) absolutely to immunize registrants, or any *person*, from prosecution under its terms.

The knowing dispensation of controlled substances by any person is made unlawful unless such act is authorized by some other provision of the Act. Thus, any person may defend against a charged violation of section 401(a) by proof that the Act elsewhere authorized his conduct. In the instant case, Moore would have a defense if he could prove that his conduct as a registrant was within the limits defined by his registration:

Persons registered . . . to . . . distribute, or dispense controlled substances *are authorized* to . . . distribute, or dispense such substances . . . *to the extent au-*

---

prisonment of not more than 2 years, a fine of $50,000, or both.

(3) Except under the conditions specified in paragraph (2) of this subsection, a violation of this section does not constitute a crime, and a judgment for the United States and imposition of a civil penalty pursuant to paragraph (1) shall not give rise to any disability or legal disadvantage based on conviction for a criminal offense. Act § 402, 21 U.S.C. § 842 (1970).

8. SEC. 403. (a) It shall be unlawful for any person knowingly or intentionally—

(1) who is a registrant to distribute a controlled substance classified in schedule I or II, in the course of his legitimate business, except pursuant to an order or an order form as required by section 308 of this title;

(2) to use in the course of the manufacture or distribution of a controlled substance a registration number which is fictitious, revoked, suspended, or issued to another person;

(3) to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge;

(4) to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this title or title III; or

(5) to make, distribute, or possess any punch, die, plate, stone, or other thing designed to print, imprint, or reproduce the trademark, trade name, or other identify-

ing mark, imprint, or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit substance.

(b) It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this title or title III. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

(c) Any person who violates this section shall be sentenced to a term of imprisonment of not more than 4 years, a fine of not more than $30,000, or both; except that if any person commits such a violation after one or more prior convictions of him for violation of this section, or for a felony under any other provision of this title or title III or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 8 years, a fine of not more than $60,000, or both. Act § 403, 21 U.S.C. § 843 (1970).

*thorized by their registration* and in conformity with the other provisions of this title.

Act, § 302(b), 21 U.S.C. § 822(b) (emphasis added). Dr. Moore admitted at trial that his registration authorized him to dispense methadone only for detoxification purposes in the course of professional practice (Tr. at 711–12). As demonstrated above, it was proven beyond a reasonable doubt that Dr. Moore was not dispensing methadone for detoxification purposes. Rather, he was simply pushing drugs for profit with no intention, and without the effect, of treating his "patients" for *any* medical purpose. Thus, since section 401(a) only provides an exception "to the extent authorized by [the applicable] registration," Dr. Moore clearly was violating section 401(a) by dispensing methadone for other than detoxification purposes.

The majority holds that section 401(a) simply does not apply to registrants. This holding is untenable because section 401(a) prohibits knowing or intentional "dispensing" and by definition of the Act registrants are practically the *only* persons who are capable of dispensing.

> The term "dispense" means to deliver a controlled substance to an ultimate user . . . by . . . a *practitioner,* including the prescribing and administering of a controlled substance . . . . The term "dispenser" means a practitioner who so delivers a controlled substance to an ultimate user or research subject.

Act, section 102(10), 21 U.S.C. § 802(10) (1970) (emphasis added). And a "practitioner"

> means a physician [and other professional people] . . . *registered . . . to . . . dispense . . .* a controlled substance *in the course of professional practice* . . . .

*Id.* § 102(20), 21 U.S.C. § 802(20) (emphasis added). Accordingly, in the prohibition of unauthorized "dispensing" as defined by the Act, Congress clearly indicated its intention to have section 401(a) apply to all registrants.

The entire thrust of the Act, moreover, demonstrates that registered physicians are "authorized" to dispense controlled substances only in the course of their professional practice, that is, for a legitimate medical purpose. The Act is replete with provisions that manifest a congressional intent to limit a registrant's authorization to conduct conforming to accepted medical practices. Section 102(20), 21 U.S.C. § 802(20) ("registered . . . to . . . dispense . . . in the course of professional practice"); § 202(b)(2)(B), 21 U.S.C. § 812(b)(2)(B) (definition of Schedule II drug: "The drug . . . has a currently accepted medical use in treatment"); § 307(c)(1)(A), 21 U.S.C. § 827(c)(1)(A) (excepting registrants from the requirement of making certain records and reports with respect to narcotics prescribed or administered "by a practitioner in the lawful course of his professional practice"); § 308(e), 21 U.S.C. § 828(e) ("unlawful for any person to obtain . . . controlled substances for any purpose other than their use . . . in the course of his professional practice"); § 404(a), 21 U.S.C. § 844(a) ("unlawful for any person knowingly or intentionally to possess . . . unless . . . obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice"); § 515(a)(2), 21 U.S.C. § 885(a)(2) ("obtained pursuant to a valid prescription from a practitioner while acting in the course of his professional practice"). These provisions combine to establish an accurate context within which the "except as authorized" proviso of section 401(a) must be construed. And that context indicates an interpretation of the Act that limits a registered physician's authorization to the dispensation of controlled substances in accordance with currently accepted medical practices. When the conduct of a registrant violates this authorized standard

he excludes his acts from the exception of section 401(a) and makes himself subject to its penalties. This interpretation results from a plain reading of the statute and is not based on provisions that are reasonably susceptible to "two readings" or dependent on prior decisions interpreting the Harrison Narcotic Act of 1914, 38 Stat. 785.

The majority perceptively notices that Dr. Moore has violated section 309 of the Act, 21 U.S.C. § 829,[9] and that the Act provides that such a violation is punishable under section 402(a)(1), 21 U.S. C. § 842(a)(1). Having demonstrated their keen sense for the obvious, the majority then conclude that since Congress covered a segment of section 401 offenses under section 402, Dr. Moore must be prosecuted under section 402 because it has less severe penalties. Majority Op. at 427. The majority fail to recognize that a registered physician cannot violate section 401(a) without also necessarily violating section 402(a)(1).[10] Their reasoning, then, leads to the pat-

9. SEC. 309. (a) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule II, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without the written prescription of a practitioner, except that in emergency situations, as prescribed by the Secretary by regulation after consultation with the Attorney General, such drug may be dispensed upon oral prescription in accordance with section 503(b) of that Act. Prescriptions shall be retained in conformity with the requirements of section 307 of this title. No prescription for a controlled substance in schedule II may be refilled.

(b) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule III or IV, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without a written or oral prescription in conformity with section 503(b) of that Act. Such prescriptions may not be filled or refilled more than six months after the date thereof or be refilled more than five times after the date of the prescription unless renewed by the practitioner.

(c) No controlled substance in schedule V which is a drug may be distributed or dispensed other than for a medical purpose.

(d) Whenever it appears to the Attorney General that a drug not considered to be a prescription drug under the Federal Food, Drug, and Cosmetic Act should be so considered because of its abuse potential, he shall so advise the Secretary and furnish to him all available data relevant thereto. Act § 309, 21 U.S.C. § 829.

10. A registered physician necessarily violates the prescription requirements of section 309 when he violates section 401(a). This is true because a prescription is an order of a physician which states the medicine to be used by a patient to treat his particular illness and is the objective manifestation of applied medical skill and experience. In short, it specifies the prescribed remedy for a particular, diagnosed illness and is thus issued for a valid medical purpose. Unless dispensed directly by a practitioner other than a pharmacist, see text at 451 supra, a Schedule II controlled substance may be dispensed by a practitioner only with a "written prescription." Act § 309(a), 21 U.S.C. § 829(a) (1970). A practitioner who dispenses a controlled substance in violation of section 401(a) without a diagnosis and not for the treatment of an illness does so for a non-medical purpose. In so doing he does not "prescribe" the drug as a remedy, even though he may have written words on an order form, and thus also violates section 309(a) by dispensing without a "prescription." See 21 C.F.R. § 306.04 (1973). Actually, the paper is a fictitious prescription and thus not a valid prescription within the meaning of the Act.

Conversely, a physician may violate section 309 without necessarily being subject to prosecution under section 401(a). That is, a physician who dispenses a controlled substance for a legitimate medical purpose in the course of professional practice but simply fails to comply with the procedural formalities of section 309 could not be prosecuted under section 401(a). For example, if a physician in good faith and for a legitimate medical purpose within the scope of his registration (e. g., detoxification) "knowingly" dispenses methadone by an oral rather than by a written prescription as required under section 309(a), he could only be prosecuted for a misdemeanor under section 402(a)(1), since this procedural infraction is specifically covered by that section. Also, his substantive conduct would be within the scope of his authorization for section 401(a) purposes, but he nevertheless would have acted in a procedurally irregular manner in violation of section 309(a). This is not, however, the situation before the court today.

ently absurd conclusion that one who commits a lesser included offense cannot be prosecuted for the greater offense because the lesser included offense provides for less severe penalties. In fact that is the basic reasoning of their opinion.

That ambiguity which the majority professes to find so obvious, however, does not exist in fact. Section 401(a) clearly applies to registered physicians when their conduct is outside the scope of their authorization, while section 402(a)(1) is clearly limited in its application to those "[m]ore or less technical violations" outlined in section 309. H. R.Rep.No.91–1444, 91st Cong., 2d Sess. 10 (1970), U.S.Code Cong. & Admin. News 1970, p. 4566. Section 309 demonstrably is purely a regulatory provision designed to insure compliance with certain procedural, in contradistinction to substantive, requirements of the Act. Thus the section designates the *form* of prescriptions issued for various scheduled controlled substances; the more dangerous the drug the more formal the prescription required. Schedule I drugs are excluded from section 309 since by definition they have "[no] currently accepted medical use in treatment" and may not be prescribed. Act § 202(b)(1)(B), 21 U.S.C. § 812(b)(1)(B). Schedule II drugs, which have "a currently accepted medical use" but may result in "severe psychological or physical dependence," *id.*, § 202(b)(2), 21 U.S.C. § 812(b)(2), may be dispensed only by a *"written* prescription," and such prescription may not be refilled. *Id.* § 309(a), 21 U.S.C. § 829(a) (emphasis added). Schedule III and IV drugs, which are relatively less dangerous, *id.* § 202(b)(3), (4), 21 U.S.C. § 812(b)(3), (4), "may be dispensed *without a written or oral* prescription in conformity with" the Federal Food, Drug, and Cosmetic Act, and such prescriptions may be refilled. *Id.* § 309(b), 21 U.S.C. § 829(b) (emphasis added). Schedule V drugs, relatively the least dangerous, *id.* § 202(b)(5), 21 U.S.C. § 812(b)(5), are subject only to the requirement

of dispensation for a medical purpose. *Id.* § 309(c), 21 U.S.C. § 829(c).

Consistent with this interpretation, the House referred to violations of section 309 punishable under section 402 as "[m]ore or less technical violations." H.R.Rep.No.91–1444, 91st Cong., 2d Sess. 10 (1970), U.S.Code Cong. & Admin.News 1970, p. 4566. Section 402, moreover, normally contemplates only a civil proceeding to remedy violations of the procedural requirements of section 309. If committed "knowingly," however, the violation may be prosecuted as a misdemeanor, Act § 402(c)(2)(A), 21 U.S.C. § 842(c)(2)(A); *id.* § 102(13), 21 U.S.C. § 802(13); 18 U.S.C. § 1 (1970), and repeat offenders may receive up to two years. In contrast to sanctions available under section 402 for procedural irregularities, section 401(a) applies to substantive conduct which exceeds the scope of that authorized by one's registration and provides for felony prosecution.

To further demonstrate the error of the majority's approach, assume the following hypothetical situation. Suppose the existence of all the facts proven in this case with the exception that Dr. Moore personally sold and delivered the dolophine pills to the individuals named in the indictment rather than writing prescriptions to be filled at a pharmacy. Since section 309 permits a physician to dispense drugs directly to the ultimate user without a written prescription, Dr. Moore would not have violated section 309 and thus could not be prosecuted under section 402(a)(1). I assume the majority would nevertheless adhere to the position that Dr. Moore "acted wrongfully." Majority Op. at 429. Assuming all the predicates of the majority opinion as given, then, Moore could not be prosecuted in this situation under either section 401 or 402. Section 402(a)(1) would not be triggered by a violation of section 309, and under the majority's theory the difference between personal and prescriptive delivery of controlled substances would be meaning-

**454**

less because registrants are not subject to section 401(a).

The majority's holding that Dr. Moore can only be prosecuted for a misdemeanor under section 402 rather than for a felony under section 401(a) produces a result not easily susceptible to rational explanation. It is beyond question, I assume, that Congress intended the revocation of registration of any physician who engaged in such palpably unlawful drug pushing as that engaged in by Dr. Moore. Revocation, however, is limited to those situations where a registrant:

(1) has materially falsified any application filed pursuant to or required by this title or title III;

(2) has been convicted of a felony under this title or title III or any other law of the United States, or of any State, relating to any substance defined in this title as a controlled substance; or

(3) has had his State license or registration suspended, revoked, or denied by competent State authority and is no longer authorized by State law to engage in the manufacturing, distribution, or dispensing of controlled substances.

Act, § 304(a), 21 U.S.C. § 824(a). There is no evidence that condition (1) has been satisfied. Revocation of Dr. Moore's registration may not be premised on condition (2) since the majority holds that he may only be prosecuted under the misdemeanor provisions of section 402, rather than under the felony provisions of section 401(a). Nor would it appear that revocation can be premised on condition (3), since D.C.Code § 2–131 similarly requires conviction of a felony before a physician's license or registration to practice medicine may be revoked. Thus section 304, premising revocation of registration upon a felony conviction, presuasively suggests that the Congress intended the felony provi-

sions of section 401(a) to be applicable to registrants, such as Dr. Moore, who exceed the scope of conduct authorized by their registration. Otherwise, doctors who trafficked in drugs could never have their registrations revoked.[11]

Moreover, the majority's decision that no registered physician can be prosecuted under section 401 of the Act is in direct conflict with recent decisions in the First, Fifth, Ninth and Tenth Circuits. In United States v. Bartee, 479 F.2d 484, 488 (10th Cir. 1973) (emphasis in original), the court specifically held that

when a medical practitioner issues a prescription which is *not* for a legitimate medical purpose and is *not* in the usual course of his professional practice,

he is subject to prosecution under section 401. The court also considered that the cases under the now repealed Harrison Narcotics Act were analogous, as the Government has argued in this case. The Tenth Circuit reaffirmed *Bartee* in United States v. Jobe, 487 F.2d 268 (10th Cir. 1973). The Fifth Circuit has aligned itself with the Tenth, indicating that a registered physician may be prosecuted under section 401

for the unlawful dispensing of a controlled substance, if his prescription is not for a legitimate medical purpose in the usual course of his professional practice . . . .

United States v. Leigh, 487 F.2d 206, 207 (5th Cir. 1973). United States v. Badia, 490 F.2d 296 (1st Cir. 1973) and United States v. Larson, 507 F.2d 385 (9th Cir. 1974) are to the same effect. Thus four circuits have held that a registered physician may be prosecuted under section 401 when he issues prescriptions for controlled substances in an unauthorized manner. I agree.

11. The Narcotic Addict Treatment Act of 1974, Pub.L.No. 93–281 (May 14, 1974), 88 Stat. 124, enlarged the powers of the Attorney General to revoke registrations. *See* text at 457 *infra*.

### III

The legislative history of the Controlled Substances Act is fairly straightforward and supports the foregoing interpretation. The Act fundamentally revised the penalty structure of the Harrison Narcotic Act of 1914, 38 Stat. 785, by implementing more rational and sophisticated sanctions based upon the nature of particular violations. Under the Harrison Act a violation of *any* of the Act's provisions uniformly was punishable by a fine of not more than $2,000 or imprisonment for not more than five years, or both. By contrast, the present Act, passed in 1970, was

> designed to deal in a comprehensive fashion with the growing menace of drug abuse . . . by providing for an overall balanced scheme of criminal penalties for offenses involving drugs.
>
> \*   \*   \*   \*   \*   \*
>
> The bill revises the entire structure of criminal penalties involving controlled drugs by providing a consistent method of treatment of all persons accused of violations.

H.R.Rep.No.91–1444, 91st Cong., 2d Sess. 1, 4 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4567, 4570. In short, the comprehensive revision was designed to make the penalty fit the crime.

The House Report indicates that registered physicians were intended to be subject to felony prosecution under section 401(a). On this point, the majority misrepresents the basic thrust of the House Report insofar as it relates to the Prettyman Commission Report by only quoting the Commission's discussion without noting or analyzing the conclusions drawn from that discussion by the House and by ignoring the specific legislative solution enacted by Congress. The Prettyman Commission focused on the difficulties faced by physicians in determining the conditions under which they lawfully could dispense narcotics in the treatment of addicts. As a result of such difficulties, "[i]n most instances they shun addicts as patients." The house reacted to this problem not by absolutely immunizing registered physicians from felony prosecution for trafficking in narcotics, as the majority holds, but by joining with the Senate in enacting section 4 of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 42 U.S.C. § 257a (1970) (emphasis added):

> The Secretary of Health, Education, and Welfare, after consultation with the Attorney General and with national organizations representative of persons with knowledge and experience in the treatment of narcotic addicts, *shall determine the appropriate methods of professional practice in the medical treatment of the narcotic addiction* of various classes of narcotic addicts, and shall report thereon from time to time to the Congress.

With respect to this legislation the House Report stated:

> Section 4 of the reported bill provides that the Secretary of Health, Education, and Welfare, after consultation with national organizations, shall determine appropriate methods of professional practice in the medical treatment of the narcotic addiction of various classes of narcotic addicts, and report thereon from time to time to the Congress. The purpose of this provision is to clarify for the medical profession in the United States the extent to which they may safely go in treating narcotic addicts as patients.

H.R.Rep.No.91–1444, 91st Cong., 2d Sess. 14 (1970), U.S.Code Cong. & Admin.News 1970, p. 4580. Immediately following this paragraph the House Report quotes that portion of the Prettyman Commission Report cited by the majority and discussed above, and then continues:

> The committee expects that the determinations made by the Secretary of

Health, Education, and Welfare will clarify for the medical profession *the conditions under which narcotic drugs may be prescribed for the medical treatment of narcotic addicts.* Although the committee is concerned about the appropriateness of having Federal officials determine the appropriate method of the practice of medicine, it is necessary to recognize that for the last 50 years this is precisely what has happened, through criminal prosecution of physicians whose methods of prescribing narcotic drugs have not conformed to the opinions of Federal prosecutors of what constitutes appropriate methods of professional practice. In view of this situation, this section will provide guidelines, determined by the principal health agency of the Federal Government, after consultation with appropriate national professional organizations. Those *physicians who comply* with the recommendations made by the Secretary will no longer jeopardize their professional careers by accepting narcotic addicts as patients.

*Id.* at 15, U.S.Code Cong. & Admin.News 1970, p. 4581 (emphasis added). See also H.R.Rep.No. 91–1603, 91st Cong., 2d Sess. 5 (Conference Report) (1970), U.S.Code Cong. & Admin.News 1970, p. 4657. Thus the Congress provided a completely different legislative and administrative solution to the problem than the majority indicates. And it is one in which the manifest intent of the Act is that physicians who comply with the terms of their registration and other applicable regulations are "authorized" under section 401(a). When they act outside the clearly defined bounds of their registration, they act in an unauthorized manner and are subject to prosecution under section 401(a).

Sharply distinguished in the legislative history from the unauthorized drug pushing engaged in by Dr. Moore and punishable under section 401(a), are violations of the regulatory provisions of section 402. A registered physician may be punished under section 402(a)(1) if he violates section 309. Section 309 simply regulates the type and nature of prescriptions required to be issued when dispensing controlled substances. As discussed previously,[12] section 309 imposes purely formal requirements—written, oral or no prescription—which vary according to the dangerousness of the drug dispensed. Thus, as the House Report states, these "[m]ore or less technical violations . . . are punishable by less severe penalties." *Id.* at 10, U.S.Code Cong. & Admin.News 1970, p. 4576. Indeed, section 402 provides that a violation of its provisions does not constitute a crime, except when committed knowingly, and then a maximum punishment of one year, or two years for repeat offenders, may be imposed. To impose such minor punishment on drug pushers would be completely inconsistent with the maximum punishments authorized by the Act for other violations. For example, under section 403(a), 21 U.S.C. § 843(a), registrants who distribute controlled substances without using the proper order form can be sentenced to imprisonment for up to four years for an initial violation and up to eight years for a second offense.[13] *Nonetheless, the majority here holds that drug pushing registrants can only be prosecuted under section 402, the principal thrust of which is to impose civil penalties, and misdemeanor punishment not to exceed one year imprisonment for the initial offense or two years for subsequent offenses.* Certainly Congress never intended such gross inequality of penalties which would punish lesser offenses more severely than greater offenses.

Further evidence that the Congress intended section 401(a) to apply to reg-

---

12. *See* text at 453, *supra.*

13. *See* note 8 *supra.*

istered physicians is contained in the Narcotic Addict Treatment Act of 1974 (NATA), Pub.L. No. 93–281 (May 14, 1974), 88 Stat. 124, and its legislative history. NATA amended the Controlled Substances Act to provide greater controls against the illegal diversion of narcotics by unscrupulous physicians, recognizing that

> most methadone diverted for illegal use and sale is derived from one of four major sources: (1) unscrupulous activities of certain individual practitioners . . . .

H.R.Rep.No.93–884, 93d Cong., 2d Sess. 3 (1974), U.S.Code Cong. & Admin. News 1974, p. 3031; S.Rep.No.93–192, 93d Cong., 1st Sess. 6 (1973). NATA implemented this objective by requiring a separate, special registration for practitioners engaged in detoxification and maintenance programs and by providing for summary revocation of such registration for failure to comply with specific standards. This special registration was designed to enable the Attorney General immediately to halt illegitimate and dangerous narcotic detoxification and maintenance programs where successful felony prosecution of registered physicians under section 401(a) would be either too difficult or too slow and time-consuming. *Id.* at 3, 11–15, U.S.Code Cong. & Admin.News 1974, p. 3035.

Moreover, the Congress continues specifically to contemplate prosecution under section 401(a) of registered physicians who engage in such illegal activities as Dr. Moore. Indeed, the Senate Report on NATA used the case of Dr. Moore as the most egregious example of an unscrupulous physician operating in illicit drug traffic prosecutable under the drug-pushing section of the Controlled Substances Act:

> In some communities, one or more physicians have contributed substantially to the illicit traffic in metha-

done. Some of these instances involved careless or unscrupulous physicians who were prescribing methadone as a pain killer, while others involved physicians who were operating as pushers under the guise of a detoxification program, for which no special registration was required. One of the most notorious cases is that of Dr. Thomas Moore who operated a "methadone program" in the District of Columbia until his final conviction of illegal distribution of methadone on an indictment alleging 38 separate counts. Moore operated from his office with impunity for over two years during which time drugs obtained by addicts from him were often found in the illicit traffic and believed to be involved in cases of narcotic overdose deaths.

> \*   \*   \*   \*   \*   \*

> Dr. Moore was eventually found guilty on 22 counts and sentenced to a term of 15 to 45 years and fined $150,000. However, if the Attorney General had had the authority provided in S. 1115, as amended, the BNDD could have moved against this dangerous profiteer far more expeditiously.

*Id.* at 7.

The only concern manifested by the Congress with felony prosecution of doctors under section 401(a) was that it may be too difficult to establish that a physician acted outside "the course of professional practice," thereby exceeding the authorization exception of section 401(a). Congress indicated its concern with

> the present difficulty in such prosecutions because of the intricate and nearly impossible burden of establishing what is beyond "the course of professional practice" for criminal law purposes when such a practitioner speciously claims that the practices in question were ethical and humanitarian in nature.

* * * * * *

As illustrated by the example of Dr. Moore, . . . the Attorney General was unable to take successful criminal action against profiteering practitioners except in the most aggravated of circumstances and then only after prolonged effort to make undercover penetrations.

*Id.* at 14, 13.[14] Thus the Congress is completely aware of the prosecution of trafficking physicians as such and it clearly was, and is, Congress' intent that registered physicians be prosecuted under the felony provisions of section 401(a) when they knowingly or intentionally dispense controlled substances other than in "the course of professional practice" and in excess of their registration.

In holding that drug trafficking registrants are absolutely immune from prosecution under the regular drug trafficking section applicable to "any person," the majority has totally misread the Act and misconstrued the legislative history. I would accordingly hold to the contrary and, having considered all the other points raised by appellant and found them to be without merit, would affirm the convictions on all counts except those in which double sentences were imposed for dispensing to minors without any such allegations being set forth in the indictment. It is my view that the count upon which a sentence is imposed must allege that the victim is a minor if the additional punishment for sale to a minor is sought to be adjudged. As to these counts, I would remand the case for resentencing.[15]

---

14. When the Dr. Moore investigation was finished, there was abundant proof that he acted outside the course of professional practice. Dr. Moore also admitted that his registration was limited to detoxification (Tr. 711–12). Thus the acts for which he was convicted were outside his authorization.

15. This refers to the sentences imposed on counts 16, 17, 18, 20, 21, 23, 24 and 25 of 10 to 30 years and $10,000 on each such count, that is, $80,000 total. I would not in any way require the district court to interfere with the consecutive nature of these sentences to the sentences on the other counts, but the court of course would also correct the total sentence in keeping with the ultimate sentences imposed.